IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN E. BROWN, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 02-1686-KAJ |
| ROBERT I. GEORGE, JAMES L. KIDD, ANGEL M. MALABET, LINWOOD N. CHATMAN, DEAN J. BLADES, BARBARA KAY COSTELLO, JULIE HARRIATT and DALE E. MILLMAN | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

---

Dawn Marie Jones, Esq., John W. Shaw, Esq., Michael William McDermott, Esq., Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000 West St., P.O. Box 391, Wilmington, Delaware 19899; Counsel for Plaintiff.

Eileen Kelly, Esq., Department of Justice, 820 N. French St., 6th Floor, Wilmington, Delaware 19801; Counsel for Defendants.

---

September 19, 2005
Wilmington, Delaware

JORDAN, DISTRICT JUDGE

## I. INTRODUCTION

Before me is a motion for summary judgment (Docket Item ["D.I."] 127, "the Motion") filed by defendants Robert George, Dean Blades, James Kidd, Angel Malabet, Linwood Chatman, Barbara Kay Costello, Julie Harriatt, and Dale Millman.[1] The Complaint by John E. Brown ("Brown") alleges that Defendants and George violated his right to be free from cruel and unusual punishment while he was an inmate at the Sussex Violation of Probation Center ("SVOP"). (D.I. 97 at ¶¶ 31, 35, 38, 42, 43, 46, 49.) Brown's complaint alleges violations of the Eighth and Fourteenth Amendments to the Constitution under 42 U.S.C. § 1983, a violation of Article I, Section 11 of the Delaware Constitution, a claim for assault and battery, and a claim for unlawful deprivation of the right to be treated humanely under 11 *Del. C.* § 6531. (*Id.* at ¶¶ 31-36, 38, 42, 43, 46, 49.)

Jurisdiction over the § 1983 claim is appropriate under 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction exists over the other claims under 28 U.S.C. § 1367. For the reasons that follow, I will grant summary judgment for Defendant Robert George on all claims. Additionally, I will grant summary judgment for all Defendants as to claims against them in their official capacities. However, I will deny summary judgment with respect to the claims against Kidd, Malabet, Chatman, Blades, Costello, Harriatt, and Millman in their individual capacities.

---

[1] Defendant Robert George will be referred to herein as "George." Defendants James Kidd, Angel Malabet, Linwood Chatman, Barbara Kay Costello, Julie Harriatt and Dale Millman will be collectively referred to as "Defendants." Robert George is not included in the designation "Defendants" unless otherwise noted.

## II. BACKGROUND[2]

John E. Brown was an inmate at SVOP from approximately June 4, 2002 until late October of 2002. (D.I. 129 at A-190.) SVOP is a Level IV facility which serves the state's effort to "house violation of probation offenders in low-grade, non-secure, military style 'work camps.'" 71 Del. Laws 354, at 226 (1998). It is located at the Sussex Community Corrections Center ("SCCC"), which also houses the Sussex Work Release Center. (D.I. 128 at 3.) At SVOP, inmates are required to go out on work crews on a daily basis, performing community service projects both inside and outside of SCCC. (D.I. 129 at A-118.)

To encourage inmate compliance with the rules, officers at SVOP can assign inmates to perform tasks, which are known as "Extra Work Incentive" ("EWI"). (D.I. 129 at A-142.) EWI is assigned to inmates at SVOP who, for example, "display bad attitudes, do not set up their living area as instructed, talking (sic) in the hallways or chow hall...". (*Id.* at A-142.) Tasks assigned to inmates who are given EWI range from stacking firewood to scrubbing the parking lot with a toothbrush. (*Id.* at A-134.) EWI tasks are designed to be tedious or tiring, in an attempt to deter future rule-breaking. (*Id.* at A-148.) EWI can be assigned "instantly" by an officer at the time of a rule infraction, or by the Multi-Disciplinary Team in response to an officer's report of an inmate's infraction. (*Id.* at A-147.)

---

[2] The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party.

At SVOP, officers carry cap-stun[3] to be used for self-defense, defense of others, and to "maintain order and control." (D.I. 129 at A-38-39.) Cap-stun comes in two sizes: a five-ounce can, known as a 305, and a ten ounce can, known as a 505. (*Id.* at A-60.) The 505 is also known as a "party can" or a "riot can." (D.I. 136 at B395-396.) Some officers, including Corporal James Kidd ("Kidd"), carry both sizes. (D.I. 129 at A-60.) SVOP does not directly track the issuance of cans of cap-stun to its officers. (*Id.* at A-57.) Cap-stun is tracked only through reports that are filed when it is used on an inmate. (*Id.*) To get a new or additional can of cap-stun, an officer simply has to request one. (*Id.*)

The events relevant to the instant action took place on June 27, 2002. On that morning, at about 8 a.m., Brown and other inmates were on the quarterdeck,[4] getting ready to go out with a work crew. (D.I. 136 at B380; D.I. 129 at A-273.) Kidd was calling the roll of prisoners when he and Brown became involved in a verbal

---

[3] Cap-stun, otherwise known as pepper spray, is a cayenne pepper based aerosol spray. (D.I. 129 at A-161.)

[4] The quarterdeck is an area outside SVOP, but within its fenceline, where work crews assemble on painted footprints before leaving for their work assignments. (D.I. 129 at A-107.)

altercation.[5] (D.I. 136 at B380.) After this altercation, Kidd ordered Brown to a woodpile to perform "instant" EWI. (D.I. 129 at A-44-45.)

Brown alleges that at the woodpile, Kidd ordered him to perform an exercise called the "mule kick," which required Brown, on his hands and knees, to kick a log around the woodpile. (D.I. 129 at A-198.) When, after two times around the woodpile, Brown became exhausted, Brown alleges that Kidd threatened to spray him with a can of cap-stun "the size of a can of pork and beans"[6] if he didn't continue kicking the log. (Id. at A-199.) After Brown pleaded that, due to his age and the heat, he could not continue, Kidd gave Brown a smaller log and instructed him to place it on his chest and, while propping himself up with his arms and legs beneath him, to move around the woodpile on "all fours." (Id. at A-199.) After moving halfway around the woodpile, Brown claims that he again became exhausted, and pleaded with Kidd to allow him to stop. (Id. at A-200.) Kidd again threatened Brown with the can of cap-stun, struck

---

[5] The parties dispute why the altercation started. Brown claims that Kidd came up to him and told him to be quiet, although he was silent and staring straight ahead. (D.I. 129 at A-197.) Brown further claims that Kidd began yelling at him for talking and for staring at Kidd. (Id.) When Brown replied that he was not staring at Kidd, Kidd ordered him to go to the woodpile. (Id.) An eyewitness claimed that the altercation started because Brown replied "yes" rather than "yes, sir" when Kidd called his name during roll call. (D.I. 136 at B380.) Defendants claim Brown was talking in a loud and belligerent manner, and became more belligerent when Kidd tried to address him, claiming that his rights were being violated and that he could not be forced to work for nothing. (D.I. 129 at A-273.)

[6] Here, according to another witness, Brown is referring to the 505, or ten-ounce can of cap-stun. (D.I. 136 at B395.)

4

Brown on the shoulder with his hand and pulled Brown up so that he was standing. (*Id.* at A-201.)[7]

According to Brown, Kidd then pointed the can of cap-stun at Brown. (D.I. 129 at A-201.) Brown covered his face with his hands, and as Kidd began to spray, began to move backwards away from Kidd.[8] (*Id.* at A-201.) Brown claims that when he was four-feet away from Kidd, he stopped. (*Id.*) Kidd then pulled out his radio, and called for assistance. (*Id.*) Brown states that Kidd began to move toward him again, and he again started to back away. (*Id.*) Kidd ordered him to get down on the ground. (*Id.*) Brown refused, and continued to back away, eventually turning and running from Kidd. (*Id.* at A-202.) Brown next claims that he saw a number of corrections officers coming toward him.[9] (*Id.*) At that point, Brown alleges that he ran toward the officers, raising his hands up in surrender in the hope that the other officers would keep Kidd from

---

[7] Defendants do not dispute that the EWI activities that Brown alleges Kidd ordered him to perform were not included on SVOP's list of approved EWI. (D.I. 128 at 9, n.5; D.I. 129 at A-144-45.)

[8] It is undisputed that Brown was not hit with the cap-stun at this point. (D.I. 136 at B453.)

[9] None of the witnesses gives a clear picture of which officers responded to Kidd's call for back-up. Brown claims he saw Barbara Kay Costello ("Costello"), Julie Harriatt ("Harriatt"), Angel Malabet ("Malabet"), and Linwood Chatman ("Chatman"). (D.I. 129 at A-212.) Brown claims that he heard from other inmates that Dale Millman ("Millman") and Dean Blades ("Blades") were also present. (*Id.* at A212-13.) Kidd claims that he recalls Chatman, Millman, and Malabet. (*Id.* at A-50.) Other witnesses remember some of the officers who were present, but no witness is sure exactly who was there, or exactly what each officer did. (*Id.* at A-71, A-110-12, A-162-63; D.I. 136 at B390-96.) Costello, Millman, and Harriatt all state that they were present. (D.I. 129 at A-115, A-152-53; D.I. 136 at B548-51.) Blades says he was present, and that he secured Brown's legs while Chatman and Malabet handcuffed him. (D.I. 129 at A-162.) Chatman says that he tackled Brown, and that he and Malabet handcuffed him. (D.I. 129 at A-130, A-65, A-69.)

spraying him with the cap-stun. (*Id.*) He states that when he got close to the officers, he laid down on his stomach voluntarily and put his hands behind his back. (*Id.*)

Brown next claims that he felt a knee in his back,[10] and someone handcuffing him. (D.I. 129 at A-202.) He alleges that one officer grabbed his hair and pulled his head up, and that another officer began spraying him with cap-stun.[11] (*Id.* at A-203.) Brown claims that the cap-stun was held about three inches from his face, and sprayed for about six seconds. (*Id.*) Witnesses also say that the cap-stun was held close to Brown's face. (D.I. 136 at B423.) Next, Brown alleges that the officer who grabbed his hair smashed his face into the sand. (D.I. 129 at A-203.) Brown says that his head was again lifted, he was sprayed for another six seconds with a second can of cap-stun, and then his head was again smashed into the sand. (*Id.*) He was then taken back to the quarterdeck, where he collapsed. (*Id.* at A-204) Brown alleges that he was left on the quarterdeck in the hot sun for about an hour and fifteen minutes, during which time he attempted to walk around, pled for someone to give him water, and urinated on himself. (*Id.* at A-204-05.)

---

[10] In his first deposition, Brown identified the officer who pinned him with a knee as Dean Blades. (D.I. 129 at A-235.) Brown now says that he does not know which officer put his or her knee is his back. (*Id.* at A-202.)

[11] Defendants state that the two officers who handcuffed and sprayed cap-stun on Brown were Linwood Chatman and Angel Malabet. (D.I. 129 at A-65, A-69.) In his first deposition, Brown thought that Barbara Costello handcuffed him and Kidd sprayed the cap-stun. (*Id.* at A-235.) In his second deposition, two years later, Brown stated that he did not know who handcuffed him or sprayed the cap-stun. (*Id.* at A-202.)

6

Brown alleges that he heard the voice of Lieutenant Costello[12] ask another officer what was wrong with Brown. (*Id.* at A-205.) When Lt. Costello learned that Brown had been sprayed with two cans of cap-stun, Brown alleges that Costello said "[t]hat is too much." (*Id.*) Brown next claims that Lt. Costello said "[l]ift him off the quarterdeck before he suffocates and get him inside the air-conditioning and also in the shower." (*Id.*) Medical records indicate that Brown was seen by medical personnel at 10:30 that morning. (D.I. 129 at A-270.) Brown alleges that as a result of the incident on June 27, his left eye was injured. (D.I. 97 at ¶ 23.)

Defendants present an almost entirely different version of the events of June 27, 2002. The parties dispute why the altercation between Brown and Kidd started. (*See supra* n.4.) Additionally, Defendants dispute the nature of the EWI Brown was assigned, claiming that he was told to roll the log around the woodpile with his hands. (D.I. 129 at A-45.) Further, Defendants allege that when Brown stopped his EWI activity, he was ordered by Kidd to start again. (*Id.* at A-45.) Defendants claim that Kidd then drew a 305 size can of cap-stun, at which point Brown ran away from Kidd. (*Id.* at A-45.) Kidd began to chase Brown, and called for backup. (*Id.* at A-49.) Defendants also allege that Brown did not surrender voluntarily to the guards who came, but that Chatman tackled him, and then handcuffed him with the help of Malabet. (*Id.* at A-65, A-69.) Defendants claim that during this altercation, Brown would not stop struggling, and so Malabet sprayed him with cap-stun for one or two seconds. (*Id.* at

---

[12] Lieutenant Costello and Defendant Sergeant Barbara Kay Costello are two different people. (D.I. 129 at A-205-06.) Lieutenant Costello is not a defendant in this action.

A-65, A-69.) Defendants assert that this was the only time that Brown was sprayed with cap-stun during the incident, and they deny that two cans of cap-stun were used on him. (*Id.* at A-74.) Defendants further deny that Brown's head was smashed into the ground, or that a knee was pushed into his back. (*Id.* at A-74-75.)

Finally, Defendants assert that Brown's eye injury was not caused by the incident on June 27, 2002. (D.I. 129 at A-322-23.) While Defendants' expert agrees with Brown's expert that his vision problems were caused by "abnormalities of the left fovea," Defendants dispute that this injury could have been caused by Brown being sprayed with cap-stun. (*Id.*)

It is undisputed that Warden George was not present at the woodpile during the incident on June 27, 2002. (D.I. 129 at A-209.) It is also undisputed that Kidd had previously been suspended by Warden Robert George ("George") for using excessive force in an incident involving cap-stun. (*Id.* at A-7-9.)

## III. STANDARD OF REVIEW

A court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir.

8

1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV. DISCUSSION

In their Motion, Defendants and George claim that they are entitled to summary judgment for three reasons. First, they argue that the Eleventh Amendment precludes their being held liable in their official capacities. Second, they argue that Brown cannot prove that each individual Defendant was personally involved in the events at issue. Third, they argue that they are entitled to summary judgment on all of Brown's state law claims under Delaware's State Tort Claims Act. Finally, they argue that they are entitled to qualified immunity, thus relieving them from liability. I will grant summary judgment to all Defendants as to the claims brought against them in their official capacities, as these claims are precluded by the Eleventh Amendment. Further, I will grant summary judgment to Defendant George, as the undisputed facts show that he is not liable for any potential violations of Brown's constitutional rights. However, I will deny summary judgment as to the claims brought against Defendants Kidd, Malabet, Chatman, Blades, Costello, Harriatt, and Millman in their individual capacities, as there are disputed issues of material fact with respect to their personal involvement, with

respect to whether they are entitled to qualified immunity, and with respect to whether they are entitled to immunity under the Delaware State Tort Claims Act.

### A.   Eleventh Amendment Immunity

First, the Eleventh Amendment protects Defendants from liability in their official capacities. The Eleventh Amendment proscribes any suit against a state, or against a state agency or department or a state official when "the state is the real, substantial party in interest," unless the state consents to suit. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-101 (1984). A plaintiff may sue a state official for monetary damages, but "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Department of Treasury of State of Indiana*, 323 U.S. 459, 464 (1945).

Here, Brown is suing George, Kidd, Malabet, Chatman, Blades, Costello, Harriatt, and Millman for "compensatory and punitive damages... in their individual and/or official capacities...". (D.I. 97 at 12.) However, the Eleventh Amendment bars Brown's recovery of monetary damages against the Defendants and George in their official capacities. Because Brown does not request any other relief, summary judgment for all of the defendants in this case is granted with respect to the claims against them in their official capacities.

### B. Personal Involvement

#### 1. Warden George

To be held liable for a civil rights violation, a defendant must be personally involved in the alleged wrong. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Therefore, for a supervisor to be liable for the wrongs committed by his subordinates, the supervisor must be personally involved in those wrongs. *Id.* This liability cannot be based solely on *respondeat superior*, but may be shown in one of three ways. *Id.* First, a supervisor is personally involved in a constitutional violation committed by a subordinate when the supervisor personally directs a subordinate to undertake the particular action in question. *Id.* Second, a supervisor's actual knowledge and acquiescence can show personal involvement.[13] *Id.* Finally, "defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 586 (3d Cir. 2004) (internal citations omitted).

---

[13] "[S]upervisory officials have no affirmative duty to train or discipline an offending subordinate." *See Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir.1986) (*citing Rizzo v. Goode*, 423 U.S. 362, 377 (1976)). But, "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir.1997) (footnote omitted).

It is undisputed that George was not present during the event of June 27, 2002. (D.I. 129 at A-209.) There is nothing in the record to indicate that George personally directed the incident. Instead, Brown alleges that George was at fault for failing to have an adequate grievance procedure in place at SVOP. (Id. at A-215.) Brown further contends that because Kidd had previously been involved in a cap-stun incident for which he was suspended by George, George had reason to know that Kidd might present a danger to Brown. (Id. at A-7-9.) However, none of Brown's allegations establish that George either had knowledge of acquiesced to the incident with Brown, or that George maintained a policy that directly caused the violation of Brown's rights. In fact, George did not receive Brown's complaint about the June 27 incident until sometime between July 25 and 30, a month later. (Id. at A-13.) George claims, and Brown does not dispute, that he never met Brown until July 22, 2002. (Id. at A-12.) Further, the facts in the record do not show that George's grievance policy or cap-stun policy directly caused the injury to Brown.[14] As a result, George cannot be found to be personally involved in any potential violation of Brown's constitutional rights. Therefore, I will grant summary judgment to Warden George.

### 2. Other Defendants

Again, in order to be liable under § 1983 for a violation of Brown's civil rights, the other Defendants must have been personally involved in the altercation with Brown. There are two ways in which these Defendants could have been personally involved: (1)

---

[14] Brown claims that George encouraged the use of cap-stun in the way that it was used against him. (D.I. 135 at 33-34.) However, there is no support in the record for such a claim.

12

by being present during the altercation and (2) by failing to intervene. *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). First, when it is clear that a defendant was present during an alleged Constitutional violation, but it is unclear whether that defendant actually participated in the violation, summary judgment should be denied as to that defendant. *See Smith*, 293 F.3d at 650 (reversing summary judgment for corrections officers who were present at the beating of an inmate but whose participation in the beating was disputed). Here, it is undisputed that Kidd, Malabet, Chatman, Blades, Costello, Harriatt, and Millman were all present during the altercation with Brown. (*See supra* at n.9.) However, Brown is unsure who actually participated in the incident, and Defendants and other eyewitnesses present an unclear picture. (*Id.*) As a result, Defendants are not entitled to summary judgment in their individual non-official capacities.[15]

Viewed in the light most favorable to Brown, as is required in considering the Motion, the facts continue to contain genuine, material issues with respect to whether Defendants Kidd, Malabet, Chatman, Blades, Costello, Harriatt, and Millman were personally involved in violating Brown's constitutional rights. Therefore, as to those issues, summary judgment is inappropriate with respect to these Defendants.

---

[15] Whether the Defendants might, even if not personally involved, also face liability for failure to intervene in the alleged cap-stun assault and beating also remains an open question. *Cf. Smith*, 293 F.3d at 650. ("[A] police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior.")

### C. State Tort Claims Act

Delaware's State Tort Claims Act protects state employees and officials from liability for acts that (1) "arose out of and in connection with the performance of an official duty... involving the exercise of discretion;" (2) "[were] done in good faith and in the belief that the public interest would best be served thereby;" and (3) "[were] done without gross or wanton negligence." DEL. CODE ANN. tit. 10, § 4001. Here, the facts are highly disputed as to whether Defendants acted in good faith and without gross or wanton negligence during the June 27, 2002 incident with Brown. If Defendants in fact treated Brown the way that Brown alleges they did on June 27, 2002, their actions may ultimately be found to be lacking in good faith and grossly negligent. Therefore, because of these disputes of material fact, summary judgment on this issue must be denied.

### D. Qualified Immunity

Regardless of their personal involvement, Defendants are entitled to summary judgment if their actions are protected by qualified immunity. Government officials are protected by the doctrine of qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity, a court must first determine whether "the facts alleged show the officer's conduct violated a constitutional right." *Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003). Next, the court must determine whether the violated right was one that was clearly established. *Id.* at 786. To be clearly established, "the contours of the right must be sufficiently clear that a

14

reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, the unlawfulness of the conduct must be apparent in light of pre-existing law. *Id.*

Therefore, I must first examine whether the corrections officers in this case used excessive force in violation of the Eighth Amendment. That inquiry focuses on five factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response." *Smith v. Mensinger*, 293 F.3d 641, 649 (3d. Cir. 2002), *citing Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000), *citing Hudson v. McMillian*, 503 U.S. 1, 7 (1992).[16]

---

[16] Generally, the test for whether excessive force was used is the same under either the Eighth or the Fourteenth Amendment. *See, e.g, Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir.1996) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners. However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees.") (internal citations omitted). I am not aware of any case, and none has been cited to me, that suggests that the standard for determining whether excessive force has been used is different under the Eighth Amendment than it is under the Fourteenth Amendment. The Eighth Amendment provides specific protection from excessive force for prison inmates, while the Fourteenth Amendment must be used by pretrial detainees and the general public to protect against such force. *Robinson v. Pickett,* 16 Fed.Appx. 577, 579 (9th Cir. 2001) ("[p]rison inmates, in contrast with pretrial detainees or persons with unrestricted liberty, are protected against unjustified force by the Cruel and Unusual Punishments Clause of the Eighth Amendment and gain no greater protection from the Fourteenth Amendment.").

15

Here, the material facts are highly disputed. First, Brown alleges that he ran from Kidd because he was afraid of being sprayed with cap-stun (D.I. 129 at A-202); Kidd, on the other hand, alleges that he was afraid that Brown would incite the other inmates. (*Id.* at A-49.) Further, Brown alleges that he voluntarily surrendered to Defendants, making the use of force unnecessary (*Id.* at A-202), while the Defendants allege that they had to tackle Brown, and that cap-stun was simply used to subdue him. (*Id.* at A-65, A-69.) There is also a significant dispute as to the extent of Brown's injuries, as Brown alleges that he suffered an injury to his eye as a result of the events of June 27, 2002 (D.I. 97 at ¶ 23), while the Defendants allege that it was impossible for Brown's eye injury to have been caused by their actions. (D.I. 129 at A-322-23.) Viewing the facts in the light most favorable to Brown, there are disputes of material fact as to whether Brown's Eighth Amendment right to be free from cruel and unusual punishment was violated.

The next step is to determine whether the right at issue was clearly established. *Hamilton*, 322 F.3d at 786. This is done by examining whether a reasonable official would understand that he is violating that right, such that "in the light of pre-existing law the unlawfulness [of the official's conduct] [is] apparent." *Anderson*, 483 U.S. at 640. An official is not entitled to qualified immunity "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the action was lawful]; but if officers of reasonable competence could disagree on this issue, immunity should be

recognized." *In re City of Philadelphia Litigation*, 49 F.3d 945, 961-62 (3d Cir. 1995) *quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Here, the Eighth Amendment right to be free from cruel and unusual punishment is clearly established. Furthermore, it is clear from the existing law that the use of excessive force by a prison guard against an inmate is a violation of this right. *See, e.g., Amaro v. Taylor*, 170 F. Supp. 2d 460 (D. Del. 2001) (denying qualified immunity to prison guards who used excessive force against an inmate). Looking at the facts in the light most favorable to Brown, the use of cap-stun against Brown and the smashing of his face into the ground could constitute excessive force, and would thus be unlawful in light of the existing law. Because the facts on this issue are disputed, Defendants are not entitled to summary judgment on qualified immunity grounds.

## V. CONCLUSION

Accordingly, I will grant summary judgment as to the claims against Defendant George, and as to the claims against Defendants Kidd, Malabet, Chatman, Blades, Costello, Harriatt, and Millman in their official capacities. However, I will deny summary judgment as to the claims against Kidd, Malabet, Chatman, Blades, Costello, Harriatt and Millman in their individual capacities. An appropriate order will follow.